**Tom E. CHAPPELL, Plaintiff,**

v.

**GENERAL MOTORS CORPORATION, Defendant.**

**Civ. A. No. 78–2163.**

United States District Court, D. South Carolina, Columbia Division.

July 9, 1980.

On Motion To Vacate or Amend March 6, 1981.

On Renewed Motion for Summary Judgment April 3, 1981.

Robert E. Staton, Columbia, S.C., William R. Byars, Jr., Camden, S. C., for plaintiff.

Claude M. Scarborough, Stephen G. Morrison, Rhett Dove, Columbia, S. C., for defendant.

## ORDER

CHAPMAN, District Judge.

This action for double actual damages and treble punitive damages under the South Carolina Dealers Day in Court Bill, (*S.C.Code Ann.*, § 56–15–10 *et seq.*) was brought by the plaintiff Tom Chappell, in November 1979, in the Kershaw County Court of Common Pleas. The defendant subsequently removed the case to this court which has jurisdiction because of diversity of citizenship between the parties. Each party has moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Plaintiff moved for summary judgment in October 1979, as to the first cause of action, and subsequently made a similar motion as to the second cause of action in December 1979. Defendant's motion for summary judgment was filed in November 1979.

The surrounding circumstances giving rise to this action are summarized as follows. Plaintiff entered into an agreement with his son, Dennis S. Chappell, and Preston J. Kool in March 1978. Dennis Chappell is the dealer-operator for a General Motors dealership known as S–J Chevrolet-

Buick (hereinafter S–J). He and Preston Kool were the sole stockholders in the dealership in 1978, each owning 1,000 shares of S–J stock. Pursuant to this agreement, Preston Kool was to sell plaintiff six hundred (600) shares of S–J stock for $5,000. Dennis Chappell was to subsequently purchase the remaining 400 shares of stock owned by Kool on January 15, 1980. The agreement further provided that S–J would pay plaintiff $70,000, representing the principal of loans made by plaintiff to S–J. Plaintiff also agreed to loan to Dennis Chappell $70,000 and to sell S–J the 600 shares of S–J stock in three equal annual increments beginning in 1981. Dennis Chappell agreed to repay loans to officers due S–J in the total sum of $91,000—approximately $80,000 payable immediately upon approval of the agreement and $11,000 payable within 30 days thereafter. The final provision of the agreement stated the purpose behind it:

> The present stockholders, who are parties to this agreement, agree that the corporation is in need of a new infusion of capital to enable the corporation to maintain a proper growth pattern and to that end, they have brought Thomas E. Chappell into the picture because they feel he will aid them in securing the necessary finances from a commercial lending institution which will be a $100,000 loan payable in four annual installments, with interest to be paid monthly thereon.

After execution of the agreement, the parties, as required by defendant in Paragraph THIRD (a)(iii) and (c) of the Dealer Sales and Service Agreement (Exhibit A 00001–00004, defendant's first request for admissions) and Paragraph (B) of the Management and Ownership Addendum (Exhibit A 00009, defendant's first request for admissions) gave defendant notice of its desire to make the changes in ownership set forth in the March 14, 1978, agreement. The agreement was delivered to defendant's Charlotte office. In addition to the agreement, plaintiff submitted an Application for Approval of a Financial Investment in a Chevrolet Dealership. (Exhibit 9 to deposition of John P. Eckenrode).

The transaction evidenced by the March 14, 1978 agreement was rejected by defendant on April 20, 1978. (Exhibit 11 to deposition of John P. Eckenrode). Defendant rejected the proposal for the following reasons:

> The reasons for this rejection are that the long term borrowed capital exceeds the Thirty-Seven and One-Half (37½%) per cent limits as established by our General Motors policy. Also, the assignment of all inventories, including the Two (2%) per cent hold-back as outlined in the letter from your bank, is a direct conflict with the assignment of Two (2%) per cent as now held by General Motors Acceptance Corporation. The bank included further restrictions on any other changes to be made in the dealership and this is also unacceptable to Chevrolet Motor Division.

At plaintiff's request, defendant reconsidered the proposal set forth in the March 14, 1978 agreement. In connection with the reconsideration, defendant prepared a Dealer Organization Change Proposal, dated May 25, 1978. (Exhibit 15, Deposition of John P. Eckenrode). The proposal stated that the reason for change was: "Addition of financial participant with minority interest and extension of buy-out agreement." Under the terms of the proposal, Dennis S. Chappell was to remain the owner-operator and would be the party active in the dealership. (Exhibit 15, page 2, deposition of John P. Eckenrode).

On June 7, 1978, defendant notified plaintiff and Dennis S. Chappell that the proposal dated May 25, 1978, had not been approved. (Exhibit 21, deposition of John P. Eckenrode). The stated reason for disapproval was "the proposal did not encompass sufficient working capital." During his deposition, Mr. Eckenrode, the assistant zone manager for the Chevrolet Motor Division, testified that the March 14, 1978 agreement was rejected for several reasons. One of these reasons was that there was no infusion of new capital to assist the dealership which was drastically deficient in

owned net working capital. Eckenrode testified that in order to approve the addition of another stockholder, that stockholder would have had to provide additional capital to the corporation. Eckenrode noted that the dealership had had problems in recent years with under capitalization and the reorganization proposed in the March 14, 1978 agreement did not address that critical problem, thus it was rejected. (Dep. of John Eckenrode pp. 114–118, 142–153).

In order to fully understand defendant's rejection of the March 14, 1978 agreement, it is necessary to briefly review the undisputed facts surrounding S–J's financial position in the years from 1975 to 1978. Dennis Chappell began operating S–J in 1975. He and the defendant had previously executed several agreements which together constitute the Dealer Sales and Service Agreement. It is uncontradicted that the Dealer Sales and Service Agreement executed by Dennis Chappell and defendant contained a Minimum Capital Standard Addendum which required initially that S–J maintain a minimum owned net working capital of $288,000. This standard was applicable to S–J from November 1975, until mid-summer of 1978. (Deposition of Dennis Chappell, page 49). This minimum owned net working capital is described as the minimum amount which the manufacturer has determined is necessary for the dealer to properly conduct and complete dealership operations as contemplated under the Sales and Service Agreement. Dennis Chappell admitted that he signed the agreement setting forth the minimum owned net working capital for S–J. Dennis Chappell further testified that the standard was later changed to $380,000 beginning June 1, 1978, and that he was notified of this change in May of 1978. (Deposition of Dennis Chappell, pages 49, 78 and 123).

The minimum owned net working capital for S–J was established pursuant to defendant's Dealers Capital Standard Program, which is described as follows:

The respective Car and Truck Division of General Motors Corp. have endeavored, through the General Motors Capital Standard Program, to help franchised dealers develop sound financial positions. Over the years, this program has contributed substantially to the effectiveness and relative permanency of these franchise dealers as a whole.

In working toward its long-range purposes and objectives, the General Motors Dealers Capital Standard Program is aimed at establishing as a standard the minimum amount of regularly needed net working capital which should be provided by the owners through capital stock, other investment and earnings.

A minimum net working capital standard is established for each dealer based on the dealership operations it is expected to conduct under the Dealer Sales and Service Agreement(s) under which it is franchised by a Division(s) of General Motors Corporation. A dealer having actual net working capital equal to the standard established for the dealership operations contemplated at its dealership location(s) should have net working capital sufficient to operate through normal variations in the business cycle, provided its management prudently maximizes the use of those funds.

Net working capital as it is commonly understood is the difference between current assets and current liabilities without reference to the source from which the working capital has been obtained. As used herein, however, the actual dealer net working capital to be compared to the standard shall be determined by subtracting total liabilities, except those liabilities secured by a mortgage on land and buildings, from the sum of Total Current Assets and the book value of Driver Training Vehicles and Lease and Rental Units. This exception is made because dealers are not required to own the land and buildings which they use. Many dealers, however, elect to acquire and hold title to all or a portion of such real property, thereby investing a portion of the total equity capital in land and buildings which would otherwise be available for working capital purposes. (Minimum Capital Standard Addendum, Exhibit 2, page 2, deposition of Dennis Chappell).

As part of its Dealers Capital Standard Program, defendant requires an operating report that must be submitted periodically by the dealer to General Motors, a portion of which deals directly with the owned net working capital of the dealership and compares it with the standard. The operating report covering the 12-month period from January 1, 1976 to December 31, 1976, shows the actual owned net working capital of S–J at $220,551 and the standard at $288,000. (Exhibit 3, page 3, deposition of Dennis Chappell). The operating report for the period covering January 1, 1977 to December 31, 1977, shows S–J's reported net owned working capital at $277,225 while the standard was $288,000. (Exhibit 3, page 6, deposition of Dennis Chappell). The discrepancy between the actual reported owned net working capital during 1976 and 1977 and the owned net working capital standard showed S–J to be deficient, but apparently, not critically deficient.

However, both of these operating reports presented a rather distorted picture of the true owned net working capital of S–J. The fact was that the owned net working capital was substantially lower than was represented in the operating reports. This was because Dennis Chappell had made several withdrawals from S–J's capital account to cover various personal expenses incurred when he first started working for S–J. The net balance of these withdrawals was approximately $91,330. The withdrawals were made in addition to Dennis' monthly salary. These personal loans were charged to the corporation's receivable account, rather than the account for loans to officers. Thus, $91,330 was shifted from being a long term asset not affecting the total net working capital figure to a current asset which was calculated in the net working capital. (Exhibit 3, page 3, deposition of Dennis Chappell). The improper reporting of the $91,330 resulted in the owned net working capital of the company being exaggerated by $91,330. Thus, in 1976 and 1977 S–J's owned net working capital was only $139,221 and $183,895 respectively, amounts substantially lower than those presented in the dealer operating reports.

Dennis Chappell testified in his deposition that the improper reporting of the loans he received was a result of an in-house accounting error. This error was corrected when discovered by an outside accountant who was brought in by Dennis for the purpose of clarifying S–J's true financial position. Upon discovery of the error, the loans were properly reported in an operating report covering the months of January and February of 1978. (Exhibit 6, page 1, deposition of Steve Chappell). That report showed that the net working capital of S–J was only $30,519, $250,000 below the capital standard agreed to by Dennis Chappell and the defendant in 1975.[1] This was the last operating report received by the defendant prior to receiving the proposed agreement of March 14, 1978.

It was against this backdrop that the defendant rejected the March 14, 1978 agreement between the plaintiff, Preston Kool, and Dennis Chappell. Following defendant's rejection, plaintiff instituted this action. Plaintiff contends in its first cause of action that the Dealer Sales and Service

---

1. In its brief and during oral argument defendant claimed that the owned net working capital in January and February of 1978 was actually a negative figure of $39,481; $327,481 below the agreed minimum owned net working capital standard. This position is based on the fact that a $70,000 loan made by plaintiff to S–J in 1976 and still outstanding as of 1978, was reported under mortgages payable, a figure not involved in the owned net working capital computation, rather than in long term debt. This was true even though the $70,000 was not secured by S–J property, and thus was not in fact a mortgage. In his deposition, Dennis Chappell testified that the loan was reported in this manner pursuant to instructions from agents of the defendant, therefore the financial report of the dealership was not distorted as of March of 1978. (Deposition of Dennis Chappell, pages 53 through 54.) Defendant presented no evidence which would contradict Dennis Chappell's explanation of why the $70,000 loan was never computed with owned net working capital. Thus, it must be assumed that plaintiff properly reported the loan as directed by defendant and therefore the owned net working capital, as that term is defined by defendant, as of February 1978, was $30,000 and not the negative figure of $39,481 claimed by defendant.

Agreement defining the relationship between General Motors and S–J, which would require General Motors prior approval of the stock transfer evidenced by the March 14, 1978 agreement, is in violation of *S.C.Code Ann.* § 56–15–40(3)(i). The applicability and construction of that section is a central part of this case. Section 56–15–40(3)(i) states:

> [It shall be deemed a violation ... for a manufacturer] to prevent or attempt to prevent by contract or otherwise, any motor vehicle dealer or any officer, partner or stockholder of any motor vehicle dealer from selling or transferring any part of the interest of any of them to any other person or persons or party or parties; *provided, however,* that no dealer, officer, partner or stockholder shall have the right to sell, transfer or assign the franchise or power of management or control thereunder without the consent of the manufacturer, distributor or wholesaler except that such consent shall not be unreasonably withheld.

It is plaintiff's position that the stock transfer contemplated had no effect on the "power of management" or "control" of the dealership and, therefore, General Motors had no right to withhold its consent—whether reasonably or otherwise.

In his second cause of action plaintiff complains that the same set of facts give rise to a violation of *S.C.Code Ann.* § 56–15–40(3)(h) (1976). That section, in its entirety, provides:

> [It shall be deemed a violation ... for a manufacturer] to prevent or attempt to prevent by contract or otherwise, any motor vehicle dealer from changing the capital structure of his dealership or the means by or through which he finances the operation of his dealership, provided the dealer at all times meets any reasonable capital standards agreed to between the dealership and the manufacturer, distributor or wholesaler and provided such change by the dealer does not result in a change in the executive management of the dealership.

Plaintiff contends that in this case, the March 14, 1978 agreement made no change in the capital structure and thus, defendant had no right to reject the agreement. In the alternative, plaintiff contends that even if the agreement were to change the dealership's capital structure, the change would have been a beneficial one, and § 56–15–40(3)(h) was never intended to allow manufacturers to prevent beneficial changes in a dealer's capital structure.

Defendant moved for summary judgment on the basis of several alternative grounds. First, defendant contends that S–J failed to meet the agreed upon reasonable minimum capital standards, and therefore it acted in accordance with *S.C.Code Ann.* §§ 56–15–40(3)(h) and (i) in rejecting the March 14, 1978 proposal. Alternatively, defendant asserts that Chapter 15, Title 56 of the South Carolina Code violates the Equal Protection Clauses of the United States Constitution (Amendment 14) and the South Carolina Constitution (Article I, Section 3); that *S.C. Code Ann.* § 56–15–40(3)(i) is invalid because it violates the Commerce Clause of the United States Constitution (Article I, Section 8, Clause 3); that the dispute between the parties is governed by Michigan, rather than South Carolina law; and that the terms of the March 14, 1978 agreement have been accomplished, and, therefore, plaintiff should not be heard to complain of defendant's failure to consent to the agreement. For the reasons set forth below, the Court is of the opinion that the defendant is entitled to judgment as a matter of law on the ground that it acted in accordance with § 56–15–40(3)(h) in rejecting the March 14, 1978 agreement.

The first issue that must be addressed is plaintiff's contention that subsections (h) and (i) of *S.C.Code Ann.* § 56–15–40(3) must be read separately. Plaintiff asserts that even if the Court should find that defendant's rejection was justified under subsection (h), the rejection was still a punishable violation of subsection (i). Such a position is untenable. It would result in completely depriving the manufacturer of the right granted it by subsection (h) to

limit changes in a dealer's capital structure when said dealer was clearly under capitalized in contravention of a dealer sales and service agreement. The manufacturer would be helpless, in effect, to prevent changes in capital structure when such changes were accompanied by a transfer of stock that did not alter the control or power of management under the franchise agreement. Therefore, subsections (h) and (i) must be considered together and if the defendant has the right to reject an agreement pursuant to subsection (h), it cannot be held liable as a result of such rejection for a violation of subsection (i).

The second issue that arises, then, is whether or not defendant's action was justified under subsection (h). That subsection provides that a manufacturer may not prevent a dealer from "changing the capital structure of his dealership or the means by or through which he finances the dealership, provided the dealer at all times meets any reasonable capital standards agreed to between the dealership and the manufacturer." Thus, defendant must establish three things before it can justify its rejection of the March 14, 1978 agreement. It must show (1) that the agreement would have resulted in a change in the dealership's capital structure; (2) that the dealer had not at all times met the agreed to capital standards of the dealership; and (3) that said capital standards were reasonable.

As concerns the first point, there can be little question that some of the provisions in the agreement would have changed the capital structure[2] and the means by which the dealer finances the dealership. Specifically, paragraphs 3(c) and 8, express the intent of the parties to further an overall financial scheme that would have altered the dealership's capital structure. In paragraph 3(c), for example, plaintiff agreed to sell S–J the 600 shares of S–J stock he had previously agreed to purchase from Preston Kool. S–J would pay for the stock in cash. And though the agreement did not specifically provide that S–J would then retire this stock, once it had ownership of the stock pursuant to defendant's approval, retirement was the next logical step. Such retirement would have obviously changed the corporation's capital structure. In fact, Dennis Chappell admitted that this purchase by S–J would have reduced the dealership's owned net working capital by the amount paid for the stock. (Deposition of Dennis Chappell, pp. 87–90). Of course, plaintiff asserts that the agreement merely granted S–J the option to purchase the 600 shares of stock from plaintiff. But once defendant had given its approval to this option agreement, it would have had no further control over whether or not S–J exercised the option and thereby altered the capital structure.

Paragraph 8 of the agreement expressed the intention of the parties to secure a $100,000 loan from a lending institution following approval of the agreement. The loan would have resulted in an increase in the dealership's long term debt contrary to the 37.5 percent limit of long term debt provided in General Motors Dealership Guidelines.[3] This was obviously a proposal to change the capital structure and method of financing of the dealership. Plaintiff claims, however, that the agreement evidenced only an intention to try to obtain a loan, and that it did not guarantee that S–J would get the loan since the final decision on this point rested not with the parties to the agreement, but rather with the bank. Thus, according to plaintiff the agreement did not actually alter the long term debt of S–J. Pursuant to this position, plaintiff feels that the defendant should have approved the agreement, thereby allowing the parties to it to make all the preparations

---

**2.** Plaintiff in its argument focused solely on the effect the agreement would have on owned net working capital. However, the term capital structure encompasses more than mere consideration of new working capital. As defendant correctly points out, it must also include the form of the capital, and in particular, the ratio of debt to equity.

**3.** These guidelines provided that the ratio of long term debt to the owned net working capital standard was not to exceed 37.5 percent. (Deposition of John Eckenrode, p. 115).

necessary prior to securing the loan, then just as the terms of the loan were about to be finalized, defendant could then reject it as impermissible change in the capital structure. This argument defies all logic. Defendant would be placed in the absurd position of having approved of the intention to get the loan, but having rejected the loan itself. Defendant need not be forced into such a ridiculous position prior to rejecting the agreement. Additionally, plaintiff's interpretation of the agreement ignores the reality of the situation at the time the agreement was submitted to defendant. Both the plaintiff and Dennis Chappell admitted that at that time, the bank had agreed to provide the loan mentioned in the agreement. (Deposition of Dennis Chappell, p. 93; deposition of Thomas Chappell, pp. 23–24, 28). Further, in a letter to E. P. Kinney, defendant's zone manager, Dennis Chappell reaffirmed the parties' intention to obtain a $100,000 loan, and noted further that a loan commitment from the bank had already been secured. (Deposition of John Eckenrode, plaintiff's exhibit 10, p. 2). In light of these facts, it is obvious that approval of the agreement would have resulted in a change in the method of financing the dealership and its capital structure.

■ Plaintiff argues that even if the proposed agreement would have altered the capital structure, the change would have been beneficial rather than adverse, and that § 56–15–40(3)(h) must be read to allow intervention by the manufacturer only if a proposed change in capital structure adversely affects the capital position of the dealer. However, the statute clearly says that the simple failure of the dealer to meet capital standards at all times automatically triggers the manufacturer's right to review any changes in capital structure. The fact that the change may or may not benefit the dealership's capital structure is not a factor to be considered when determining whether or not the manufacturer had the right to prevent such change.

■ The second requirement necessary in order to establish that defendant's rejection was in accord with subsection (h) is that the dealer had not met the agreed to capital standards of the dealership. There can be little question about the fact that at the time the March 14, 1978 agreement was submitted to the defendant, S–J's owned net working capital was well below the agreed upon minimum standard of $288,000 and had been below that standard for over two years. Plaintiff's position on this point is that there is a disputed issue of fact as to what the minimum capital standard really is. According to plaintiff, because defendant had not closed down S–J in previous years when the dealership was seriously under capitalized, defendant had in effect waived any right to assert $288,000 as the true capital standard. This position ignores two important facts. First, while defendant knew in preceding years that S–J was having problems maintaining the proper capital standard, it was never really aware of just how serious the problem was since the improper reporting of the loans to Dennis Chappell grossly distorted the true financial picture of the dealership. There could have been no waiver of the capital standard by defendant without complete knowledge of all the facts concerning S–J's financial condition. Second, plaintiff ignores the fact that the dealer-operator himself, Dennis Chappell, had signed the addendum setting forth the capital standard, and that he acknowledged that the $288,000 standard was the figure he was striving to attain. (Deposition of Dennis Chappell, pp. 48–49, 63–64, 123). There was never any confusion in his mind as to what the minimum owned net working capital standard was. Thus, there is obviously no disputed issue of fact on this point. The second requirement of subsection (h) has been satisfied.

The final requirement of subsection (h) is a showing that the agreed upon minimum capital standard was reasonable. In the instant case, the Court need not hold specifically that the $288,000 figure is reasonable as a matter of law in order to grant defendant's motion for summary judgment. The important point is that S–J was approximately $250,000 below the owned net work-

ing capital standard at the time the agreement was rejected by defendant. Whether or not $288,000 was a reasonable standard, it can by no stretch of the imagination be argued that $30,000, or any figure reasonably close to that amount, was a reasonable amount of owned net working capital for a dealership the size of S–J. Thus, as is required by subsection (h), S–J was substantially below any reasonable standard for owned net working capital in March of 1978. Defendant's rejection of the agreement, therefore, was fully justified under the guidelines of that subsection.

IT IS, THEREFORE, ORDERED that plaintiff's motion for summary judgment is denied, and defendant's motion pursuant to Rule 56, be, and the same is hereby, granted.

AND IT IS SO ORDERED.

#### On Motion To Vacate or Amend

This matter is before the Court upon motion of the plaintiff pursuant to Rule 59(e) to have the Court vacate or in the alternative to amend its Order of July 9, 1980, in which it granted summary judgment in favor of the defendant. The plaintiff originally moved for summary judgment and contended that there were no disputes as to any material facts. However, when the Court granted summary judgment in favor of the defendant, plaintiff suddenly contended that there were a number of factual issues that could not be resolved under Rule 56.

Specifically, the plaintiff contends that there are factual disputes as to (1) whether the subject agreements would have resulted in a change in capital structure, (2) whether the dealer failed to meet agreed to capital standards, (3) whether the defendant's standards were reasonable, (4) whether defendant had waived its right to insist upon the written standard, and (5) whether there was an issue as to the defendant's real reason for disapproving the agreements.

In the original motion the plaintiff directed most of his argument to the March 14, 1978 contract and little mention was made of the amendment thereto submitted to the defendant in May 1978. As a result the Court directed its attention primarily to the March 1978 proposal and did not carefully study the May amendments. After a careful reconsideration of the May 1978 proposal, a re-examination of the deposition testimony and exhibits thereto, the Court finds that there is a question of fact as to whether the May 1978 proposal resulted in a change in the dealership's capital structure.

The primary difference between the March and May proposals was the elimination in the May proposal of a $100,000.00 bank loan to be obtained by S–J from the C & S Bank. The May proposal stated that it would increase S–J's cash position by approximately $102,000.00 without the need of the bank loan. Some of this cash was to be obtained through changes in bookkeeping and accounting procedures, but the major source of cash was to be a reduction of the dealership reserves held by GMAC and C & S Bank from two percent to one percent.

In the letter of May 24, 1978 from E. P. Kinney, Zone Manager of defendant in Charlotte, North Carolina to Dennis Chappell this part of the transaction is discussed as follows:

3.) As per the agreement reached with GMAC to release 80% of our factory receivables to us, as of April 30, 1978 that transaction would have reduced account 261 by $59,067.38.

COMMENT: GMAC does not control nor does this Division release factory receivables (2% Holdback) Account No. 261. As you know, your 2% Holdback is currently assigned to GMAC for 1978 and will be paid by Chevrolet Motor Division jointly to S–J Chevrolet-Buick, Inc., and GMAC December 1, 1978. Since 2% Holdback is carried as an asset on your statement, it will not improve either your cash position nor your working capital except as this amount accrues additional monies each month. However, should you obtain a loan for 80% of these accrued receivables, the proceeds of the loan would go to cash, Account No. 202, and an offsetting liability would balance the transaction.

4.) Also it is agreed by GMAC and C & S National Bank of Camden, South Carolina to reduce our finance reserve to 1%, our net cash gain would be $42,987.00. COMMENT: The reduction of finance reserves to one percent will transfer approximately $42,987 from reserve to cash; this merely transfers one asset to another and will not affect owned net working capital.

These two statements indicate that there is a serious question as to whether the May 1978 proposal would result in a change in the capital structure. If there were no change in the capital structure the defendant would have no right to prevent or attempt to prevent mere bookkeeping or accounting changes, even though the dealer had not at all times met the reasonable capital standards agreed upon between the dealership and the manufacturer.

There is no factual dispute that the dealership has continually failed to meet the agreed to capital standards. At no time during the history of the dealership has its owned net working capital exceeded 40% of the amount agreed to between the dealership and the manufacturer.

The plaintiff has offered no evidence that the owned net working capital standard of $288,000.00 agreed to between S–J and defendant was an unreasonable standard. The evidence is uncontradicted that the standard was set in accordance with industry practices and is necessary to provide sound financial stability to dealerships. Section 56–15–40(3)(h) gives the manufacturer the right to review changes in capital structure at any time the dealer fails to meet any reasonable capital standards agreed upon. Even with the changed financial picture alleged to result from the May 1978 proposal, S–J would not come reasonably close to meeting the agreed upon capital standard.

In view of the language contained in Paragraph E, Article VII of the Dealer Sales and Service Agreement, the course of conduct between S–J and the defendant could not be considered a waiver of the owned net working capital standard. Paragraph E provides:

The failure of either party at any time to require performance by the other party of any of the provisions hereof shall in no way affect the full right to require such performance at any time thereafter. Nor shall the waiver by either party of a breach of any provision hereof constitute a waiver of any succeeding breach of the same or another such provision and nor constitute a waiver of the provision itself.

This language is clear and unequivocal. To follow the plaintiff's argument would not only do violence to the clear intention of the agreement, but would require manufacturers to put their dealers out of business each time the dealer dropped below the minimum net working capital standard.

There is no evidence in the record that the defendant had any reason, other than those stated by the defendant, for disapproving the two proposed agreements. The plaintiff contends that there are factual disputes "as to the defendant's *real reasons* for disapproving ...." (emphasis added) but the plaintiff does not advise the Court of what these "real reasons" may be or what evidence there is to create an issue of fact on this point.

As to the March 1978 agreement plaintiff argues that the Court in its prior Order "assumed" that when S–J bought the 600 shares of its stock from the plaintiff under paragraph (c) of the March agreement, the next logical step would be to retire the stock. The Court was probably in error in assuming that there would be a next step of retirement. However, even without retiring the stock, the purchase of S–J's common stock by S–J and holding it as treasury stock without retiring it does in fact reduce the cash position of S–J by the cost of the stock. At page 3 of its new brief, the plaintiff states: "A review of the March 1978 agreement reveals S–J was not a signatory to the agreement, and therefore would not be bound to purchase any stock under the agreement unless it so elected." The plaintiff's attorney has either misstated the facts or submitted incorrect copies of the March 1978 agreement to the Court.

The agreement attached to the complaint as well as copies of the agreement attached to various depositions all are signed "S–J Chevrolet-Buick, Inc. by Dennis S. Chappell, its president." If this does not make S–J a signatory to the agreement then the Court cannot imagine what action would be required.

The plaintiff argues that S–J would not purchase the stock because it had agreed to retain the profits in the business to increase its capital position. It had agreed to do this in the past but had not done so. Plaintiff further argues that it had agreed with the defendant that it would not remove profits until its capital position had increased to the written standard, but this has never been complied with in the past, and the capital position of S–J was subjected to a $91,000.00 loan to its president which it carried on its books as an account receivable rather than a loan to an officer. Loans to officers in small corporations are always a red flag to anyone reviewing such corporation's financial statement.

The plaintiff strenuously argues that § 56–15–40(3)(h) confers no substantive rights upon automobile manufacturers. This is true, but this section provides circumstances under which manufacturers are not liable to dealers [1] under this act. If the contract between the parties contains no provision which would permit the defendant to prevent a change in the capital structure of S–J, then S–J might have a suit for breach of contract at common law, but the plaintiff would not have an action under § 56–15–40.

Since there is a factual dispute as to whether the capital structure of S–J would have been changed under the May 1978 proposal, this Court's Order of July 9, 1980 must be amended so that the motions of the plaintiff and the defendant for summary judgment are denied.

AND IT IS SO ORDERED.

### On Renewed Motion For Summary Judgment

At a pretrial conference on March 30, 1980, the defendant renewed its motion for summary judgment contending that there was no factual dispute to be submitted to a jury. Defendant contends that the May 1978 proposal made by S–J did involve a change in the capital structure of the corporation as contemplated by § 56–15–40(3)(h) of the S.C.Code of Laws 1976.

■ The Court gave the plaintiff additional time to prepare a response to this motion. This response has been received and carefully studied and is in the form of an affidavit of Dr. James B. Edwards of the University of South Carolina, the expert witness to be used by the plaintiff on the issue of possible changes to the capital structure of S–J. Dr. Edwards has concluded that there is no "material change" or "real change" in the capital structure of S–J as a result of the May 1978 proposal. However, the South Carolina legislature in passing § 56–15–40(3)(h) does not limit or qualify the word "change" and the Court cannot find any evidence of legislative intent which would allow the Court to infer that "real" or "material" should be added to the clear language of the statute. Under the statute the automobile dealer is protected from such a narrow interpretation of change in capital structure, ". . . provided the dealer at all times meets any reasonable capital standards agreed to between the dealership and the manufacturer . . .". S–J, at no time met the reasonable capital standards agreed upon between S–J and General Motors. S–J has never complained that these capital standards are unreasonable and the present plaintiff, who is not a stockholder or in any way connected with S–J except through kinship to his son, the president, has no standing to raise an issue of unreasonable capital standards.

No further recitation of the facts in this case is necessary, since the facts have been dealt with sufficiently in the two prior orders of the court filed July 9, 1980 and March 6, 1981. Originally, both parties moved for summary judgment and the July 1980 Order denied the plaintiff's motion

---

**1.** or stockholders.

and granted the motion of the defendant. Thereafter the defendant moved for reconsideration and additional briefs were submitted. The plaintiff's primary position on reconsideration was to stress the May 1978 proposal, which had not been emphasized in the briefs or arguments preceding the July 1980 Order.

By Order of March 6, 1981, the Court amended the July 1980 Order and found that many of the changes contained in the May 1978 proposal were simply changes in bookkeeping procedures, and that there could be a question of fact as to whether this proposal did involve a change in the capital structure of S–J.

■ Section 56–15–40(3)(h) refers to "... changing the capital structure of his dealership or the means by or through which he finances the operation of his dealership ...". Capital structure has not been defined by the legislature in the statute and research has not developed any judicial interpretation of capital structure in this type statute. Capital structure refers to the mix of debt and equity used to finance a corporation's operations and is usually defined as the mix of long-term debt and equity or the debt-equity ratio. Some courts have included short-term debt in capital structure. See *Citizens Utilities Co. v. Idaho Public Utilities Commission*, 99 Idaho 164, 579 P.2d 110 (1978), while others do not include short-term debt. See *Masury Water Co. v. Public Utilities Co.*, 58 Ohio St.2d 147, 389 N.E.2d 478 (1979). The Court finds that as used in the present statute, capital structure does not include short-term debt.

"Capital structure is the composition of debt and equity securities that comprise a firm's financing of its assets." [John J. Hampton, *Financial Decision Making Concepts, Problems, and Cases*, Reston Publishing Company, Inc., 1976, page 50]. "The percentage of each type of stock used by the firm—debt, preferred stock, and net worth (net worth consists of capital, paid-in capital and retained earnings)." [Eugene F. Brigham, *Fundamentals of Financial Management*, 2 Ed., The Dryden Press, 1980, page G–3.] "We may concentrate on only the long-term sources of financing, known as the capital structure of the firm." [Meigs, Mosich and Johnson, *Intermediate Accounting*, 4 Ed., McGraw-Hill Book Company, 1978, page 1069.]

General Motors has submitted its contentions as to a change in the capital structure of S–J as represented by the figures immediately below. The left-hand column represents the financial statement of the actual condition of S–J on April 30, 1978 and the figures in the right-hand column are taken from the pro forma financial statement as of April 30, 1978 if the May 1978 proposal was approved.

| | REPORT BEFORE MAY PROPOSAL EXHIBIT C | MAY PROPOSAL EXHIBIT D |
|---|---|---|
| Long Term Debt | $ 99,388 | $ 27,586 |
| Total Debt | 1,850,433 | 1,751,787 |
| Equity | 173,030 | 197,716 |
| Ratio of Long Term Debt to Equity | 99,388/173,030 or .57 to 1 | 27,586/197,716 or .14 to 1 |
| Ratio of Total Debt to Equity | 1,850,433/173,030 or 10.7 to 1 | 1,751,787/197,716 or 8.9 to 1 |

Dr. James B. Edwards has compared the figures on the balance sheet of S–J as of April 30, 1978 as follows:

As of April 30, 1978

| | Balance Sheet Prior to Proposal | | Proposed Balance Sheet | | Changes | |
|---|---|---|---|---|---|---|
| | Amount | Ratio | Amount | Ratio | Amount | Ratio |
| Total Assets | $2,023,463 | 100% | $1,949,505 | 100% | $(73,958) | 100% |

As of April 30, 1978

| Claims to Assets: | Balance Sheet Prior to Proposal | | Proposed Balance Sheet | | Changes | |
|---|---|---|---|---|---|---|
| Current Liabilities (Including demand note payable) | Amount | Ratio | Amount | Ratio | Amount | Ratio |
| | 1,822,847 | 90.09% | 1,724,201 | 88.44% | (98,646) | (1.65%) |
| Long-term Liabilities | 27,586 | 1.36 | 27,586 | 1.42 | –0– | .06 |
| Total Debt | 1,850,433 | 91.45 | 1,751,787 | 89.86 | (98,646) | (1.59) |
| Stockholders' | 173,030 | 8.55 | 197,718 | 10.14 | 24,688 | 1.59 |
| Total Claims | $2,023,463 | 100% | $1,949,505 | 100% | $(73,958) | –0% |

The primary difference in these two exhibits is in the long-term debt which before the May proposal is shown as $99,388 on the General Motors figures and the figure of only $27,586 before the proposal on the figures of Dr. Edwards. This difference results from the manner in which the sale of a parts truck would be handled (see the letter of E. T. Kinney, zone manager of GM to Dennis S. Chappell, May 24, 1978, item 6) and the removal of a $70,000 note of S–J to plaintiff, which is carried on the balance sheet as a mortgage.

Neither the parts truck nor the demand note are proper items to be included in long-term debt. Even if the long-term debt remains the same, there is a change of $24,688 in the stockholders' equity, which is included in "capital structure" of S–J. Dr. Edwards argues that this is only a 1.59% change and should not be considered. However, the statute does not provide for a de minimis rule so far as increases or decreases are concerned, the only question is whether they change the capital structure.

The statute gives the dealer and those claiming by or through him ample protection, since changes in the capital structure of any size may be made " . . . provided the dealer at all times meets any reasonable capital standards agreed to between the dealership and the manufacturer . . . ." If S–J had maintained these reasonable capital standards, it could have transferred its stock or changed its capital structure in any way it desired so long as it did not involve a sale of the franchise or the power of management and control.

Regardless of which definition of capital structure the Court employs or whether it uses the figures of Dr. Edwards or General Motors, there is no dispute that there is a change in the capital structure of S–J as a result of the May 1978 proposal— $24,688 in stockholder equity.

Plaintiff also contends that there is a factual question as to whether the consent of General Motors was unreasonably withheld. This refers to the last line of § 56–15–40(3)(i). However, any normal reading of (i) makes it clear that the matter of whether consent is unreasonably withheld applies only to the right of the dealer to "sell, transfer or assign the franchise or power of management or control" and does not apply to the anticipated sale of shares from Kool to Tom Chappell and does not apply to the change in the capital structure of S–J.

Since the May 1978 proposal did represent a change in the capital structure of the dealership at a time when the dealer had never met the reasonable capital standards agreed to between the dealership and the manufacturer, the defendant had the right to object to the May 1978 proposal, and such objection did not violate the provisions of (3)(h) or (3)(i), and the plaintiff may not maintain a cause of action under this section against the defendant for unfair or deceptive business practices.

Since there is no dispute as to a material fact and the defendant is entitled to judgment as a matter of law, the Clerk shall enter summary judgment in favor of the defendant.

AND IT IS SO ORDERED.